

FILED
03 JUL 28 PM 1:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| BOB NELSON, | ] |
|     Plaintiff(s), | ] |
| vs. | ] CV-02-CO-2028-E |
| ANNISTON COUNTRY CLUB, | ] |
|     Defendant(s). | ] |

MEMORANDUM OF OPINION

ENTERED
JUL 28 2003

I.  INTRODUCTION.

Presently before the court is a motion for summary judgment, filed by the defendant on April 18, 2003. [Doc. # 25.] The issues raised therein have been fully briefed by both parties, and are now ripe for decision. Upon due consideration, the court is of the opinion that the motion for summary judgment is due to be granted in all respects.

II.  FACTS.[1]

    A.  The Anniston Country Club.

Defendant Anniston Country Club ("ACC") is located in Calhoun County, Alabama, and employs more than twenty employees. Although ACC is managed and supervised by its general manager, Kay Isbell

---

[1] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

39

("Ms. Isbell"), the Board of Governors ("Board") holds ACC's decision-making authority, and is vested with the exclusive power to hire and fire employees. Ms. Isbell is not a member of the Board, but she attends its monthly meetings. Jim Campbell ("Mr. Campbell") is a member of the Board, and he served as Tennis Committee Chairman at all times relevant to the instant litigation.

    B.   ACC's tennis program under Peter Doohan.

In 1999, Peter Doohan ("Mr. Doohan") was ACC's Head Tennis Pro. Mr. Doohan, who held a world ranking of number two as a doubles player and number twenty-one as a singles player during his professional career, was highly regarded by the membership as an accomplished tennis player. As the Head Tennis Pro, Mr. Doohan had full authority to hire his own staff. In that capacity, in August 1999, he hired the plaintiff, Bob Nelson ("Mr. Nelson"), to be the Assistant Tennis Pro.

Mr. Nelson, who has been involved in tennis recreationally for over thirty years and was 58 at the time he was hired by ACC, never played tennis professionally. However, he attended training at Hilton Head Island to learn to be a teaching tennis pro, and he held teaching certifications through Atlantic States Tennis Association and the United States Professional Tennis Registry. Prior to being hired by ACC, Mr. Nelson worked as a part-time paid tennis instructor at Country Club Estates Recreation Center in Talladega, Alabama, for approximately two years. Thereafter, Mr.

Nelson worked as Director of Tennis at Alpine Bay Tennis and Swim Club ("Alpine") in Alpine, Alabama, for over four years. During Mr. Nelson's tenure at Alpine, the tennis program went from having no members to having eighty-five members. After leaving Alpine, Mr. Nelson served as Assistant Tennis Pro at Brook Highland Racquet Club for approximately seven months, at which point he accepted the Assistant Tennis Pro job at ACC.

Mr. Nelson's initial wage as Assistant Tennis Pro was $5.50 an hour; eventually his wage was increased to $6.00 an hour. In July 2000, Mr. Doohan left ACC to make more money working for a club in Rome, Georgia. As a result, the Board decided to ask Mr. Nelson to serve as the Interim Head Tennis Pro while Mr. Campbell and a search committee worked to find a new Head Tennis Pro.

    C.   Mr. Nelson assumes the responsibilities of the Head Tennis Pro.

After Mr. Doohan left, Mr. Campbell approached the plaintiff about becoming Interim Head Tennis Pro, but Mr. Nelson indicated that he was not interested in an interim appointment. However, he told Mr. Campbell that he would be there to keep the tennis program moving and would do what was necessary. Indeed, Mr. Nelson testified that in Mr. Doohan's absence, he was acting as the de facto Interim Head Tennis Pro. Although Mr. Nelson did not fill out a written application for the Head Tennis Pro position, he was promoted to that position a week after he first spoke with Mr. Campbell about the interim position; in his new job as Head Tennis

Pro, Mr. Nelson earned $500 a week.[2] Notwithstanding Mr. Nelson's promotion, the Board decided to search for a new Head Tennis Pro at a later time.

Mr. Campbell informed Mr. Nelson that as Head Tennis Pro, he had full discretion regarding the decision to hire additional staff. As a result, Mr. Nelson hired Tracy Reid to work in the pro shop and Taylor Lawson as a part-time Assistant Tennis Pro. Mr. Nelson testified that, due to his advanced age, it was important that his Assistant Pro be young.

D.   Mr. Nelson's tenure as Head Tennis Pro.

Mr. Nelson admits that after Mr. Doohan left, the tennis program at ACC suffered a lull in member participation. However, he attributes this lull, in part, to the fact that a number of ACC's most avid tennis players left to go to college at the time Mr. Doohan left ACC. One example of the lull in participation is that Mr. Nelson had to cancel a memorial tennis tournament scheduled to be held at ACC because only ten people signed up to play in the tournament.[3] Mr. Nelson also had to cancel one small, club-only margarita mixer due to lack of participation. However, Mr. Nelson

---

[2]The defendant insists that the position to which Mr. Nelson was promoted was that of Interim Head Tennis Pro. However, Mr. Nelson denies that the position he accepted was only interim in nature, although he admits that he believed that if a new Head Tennis Pro was ever hired, he would go back to being the Assistant Tennis Pro. Viewing the evidence in the light most favorable to Mr. Nelson, the court assumes for purposes of the motion for summary judgment that he was, in fact, promoted to Head Tennis Pro, rather than Interim Head Tennis Pro.

[3]The defendant admits that under the control of the Head Tennis Pro who succeeded Mr. Nelson, the Club had to cancel another major tournament for lack of participation.

began a new tennis program for young children called the Pee Wee tennis program; about thirty children enrolled in the program. Mr. Nelson testified that parents were enthusiastic about the Pee Wee program and that kids loved it.

Mr. Nelson alleges that on at least two occasions, Ms. Isbell told him that younger members had been complaining about a void in the tennis program. After speaking to Ms. Isbell on the first of these two occasions, Mr. Nelson asked Mr. Campbell if he had heard anything at Board meetings that should concern Mr. Nelson. Mr. Campbell assured Mr. Nelson that everyone was happy with Mr. Nelson's performance, and that, as far as the Board was concerned, Mr. Nelson was doing a great job and had nothing to worry about.

During Mr. Nelson's tenure as Head Tennis Pro, the Board discussed at two Board meetings a problem with nonmembers' use of the tennis facilities and a decline in participation in the tennis program. At the Board's April 19, 2001, meeting, a Board member recommended that ACC begin searching for a new Head Tennis Pro.

E.   ACC forms a search committee for Head Tennis Pro.

At the June 20, 2001, Board meeting, Ms. Isbell reported receiving a resume from someone interested in the Head Tennis Pro position, and the Board formed a five-member search committee to interview candidates for Head Tennis Pro. The committee was then to recommend a candidate to the Board, which had ultimate responsibility for deciding who to hire. Mr. Nelson heard there was

a search committee, but was not aware of the identities of the members thereof, and he did not ask any questions because he did not want to know if he was being replaced.

In the summer of 2001, Mr. Nelson saw the search committee members at the tennis courts watching another man play tennis with the son of a member. Mr. Nelson did not know the man but assumed he was a candidate for Head Tennis Pro. Mr. Nelson, who noted that the candidate "was older looking than [himself]" approached a search committee member and said, "Hey, I thought you were looking for a younger player." (Nelson Dep. 63.) Mr. Nelson had the impression that ACC was looking for a younger Head Tennis Pro based on Ms. Isbell's previous comments. Mr. Nelson testified that the committee member responded, "Well, we didn't realize how old he was until he got here." (*Id.*)

F.   ACC hires a new Head Tennis Pro.

Based largely on the achievements stated on his resume, and his work teaching children how to play tennis, the search committee selected John Fraser ("Mr. Fraser"), an individual younger than Mr. Nelson, to be the new Head Tennis Pro. Their selection was approved and subsequently ratified by the Board at its July 18, 2001, meeting. Mr. Fraser, as the new Head Tennis Pro, was to be permitted to hire his own staff and use his budget as he saw fit. Mr. Fraser decided that the level of participation in ACC's tennis program did not warrant hiring an additional tennis professional;

in fact, Mr. Fraser has yet to hire an Assistant Tennis Pro or anyone to perform those duties.

Mr. Nelson admits that Mr. Fraser is well-qualified to be the Head Tennis Pro at ACC. Mr. Nelson stated that Mr. Fraser's honors and achievements are "head and shoulders above" his because he had never played professionally or played in tournaments like the Davis Cup, whereas Mr. Fraser had such experience.

Ms. Isbell notified Mr. Nelson of his termination on August 31, 2001. She informed him that he was eligible for rehire, and suggested that he talk to Mr. Fraser about a possible Assistant Tennis Pro job. However, as mentioned above, Mr. Fraser has yet to hire an Assistant Tennis Pro. Along with Mr. Nelson, both of the other tennis staff members (Tracy Reid and Taylor Lawson) were terminated when Mr. Fraser was hired.

G.   Procedural history.

Mr. Nelson filed a charge of discrimination with the EEOC on February 12, 2002, and was issued a notice of his right to sue on May 22, 2002. He filed his complaint in the instant action on August 20, 2002, alleging a single claim of discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634. The defendant filed the instant motion for summary judgment on April 18, 2003, alleging the absence of any genuine issue of material fact and its entitlement to judgment as a matter of law.

III. STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting

Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV. DISCUSSION.

    A. The legal framework.

Mr. Nelson alleges that he was subjected to discrimination on the basis of age in that he was terminated and replaced by a younger individual. "Whether an employer intentionally discriminated against an employee . . . is a question of fact, which may be proved either through direct or circumstantial evidence." *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (citation omitted). If the court concludes that Mr. Nelson has not alleged any facts to support a direct evidence case, he must prove his case through circumstantial evidence, using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Damon v. Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (*McDonnell Douglas* analysis applies to ADEA claims). Under the *McDonnell Douglas* analysis, the plaintiff creates a rebuttable presumption of discrimination by proving a prima facie case of discrimination, which consists of proof that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he

was subjected to an adverse employment action; and (4) a substantially younger person filled the position that he sought or from which he was discharged. *Damon*, 196 F.3d at 1359. The defendant can rebut the presumption of discrimination by producing evidence of a legitimate, non-discriminatory reason for the challenged employment action. *Id.* at 1361. Once the presumption is rebutted, the employer is entitled to summary judgment unless the plaintiff proffers evidence from which a reasonable factfinder could conclude that the reason articulated by the defendant is mere pretext for age discrimination. *Id.*

    B.   Direct evidence of discrimination.

    Direct evidence of discrimination is evidence that "indicate[s] that the complained-of employment decision was *motivated* by the decision-maker's ageism." *Damon*, 196 F.3d at 1359 (emphasis in original). Thus, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age" constitute direct evidence of discrimination. *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990). An example of direct evidence, as explained by the Eleventh Circuit, would be "a management memorandum saying, 'Fire Earley – he is too old.'" *Early*, 907 F.2d at 1082. No evidence proffered by Mr. Nelson meets this stringent standard for direct evidence.

    Mr. Nelson alleges that the following constitutes direct evidence of age discrimination: a member of the search committee

neither confirmed nor denied Mr. Nelson's statement that the committee was looking for a younger player to fill the Head Tennis Pro position, but rather stated that the committee did not realize the age of an applicant (not Mr. Nelson) until his interview; and Ms. Isbell's comments that the younger members of ACC felt there was a void in the tennis program. These comments do not amount to direct evidence of discrimination.

First, the comment by the search committee member was not a comment on Mr. Nelson's age or the age of the ideal Head Tennis Pro at all, but rather an ambiguous response about the age of another applicant. Moreover, it is undisputed that the search committee's responsibility was merely to recommend a candidate for the Board's approval to be hired as Head Tennis Pro, and the search committee had *no* decision-making authority with respect to Mr. Nelson's termination - the allegedly discriminatory act. Therefore, the committee member's failure to confirm or deny Mr. Nelson's statement about the committee looking for a younger Head Tennis Pro, and his comment about the age of another applicant, do not constitute direct evidence of discrimination.

Moreover, Ms. Isbell's two comments about younger members' complaints in no way "tie[ ] the [alleged] discriminatory attitude [of Ms. Isbell] to the relevant employment decision." *Wright v. Southland Corp.*, 187 F.3d 1287, 1294 (11th Cir. 1999). Indeed, Ms. Isbell, who is not a member of the Board, indisputably had no input

whatsoever into the decision to terminate Mr. Nelson. As such, any discriminatory comments she made do not constitute direct evidence of age discrimination. *See Wright*, 187 F.3d at 1304 n.20; *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 (11th Cir. 1998). Because he has produced no direct evidence of age discrimination, Mr. Nelson's case must be established under the *McDonnell Douglas* burden shifting analysis.

    C.    Circumstantial evidence of discrimination.

        1.    Prima facie case.

It is undisputed that Mr. Nelson was in a protected class – he was sixty years old at the time he was terminated – and he suffered an adverse employment action when he was discharged. Moreover, he was replaced by a younger individual, thus satisfying the fourth element of a prima facie case of age discrimination. ACC argues that Mr. Nelson is unable to establish a prima facie case of age discrimination because, it alleges, Mr. Nelson was not qualified for the position of Head Tennis Pro.

In the Eleventh Circuit, a plaintiff will be found to be qualified for a position if he has held that position for a substantial amount of time without complaint. *See Damon*, 196 F.3d at 1360; *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520 (11th Cir. 1990). However, evidence of repeated failure to meet the employer's expectations is sufficient to establish that the

plaintiff was not qualified for the job in question. *Baker*, 903 F.2d at 1520-21.

Although it is clear that there was a lull in the tennis program under Mr. Nelson's supervision, and some younger members of ACC complained to Ms. Isbell, it is equally clear that some of the lull was attributable, at least in part, to several active members going to college, and Mr. Campbell indicated to Mr. Nelson that the Board thought he was doing a good job. Moreover, the Board clearly thought Mr. Nelson was qualified for the job when they promoted him to it after being familiar with his work as Assistant Tennis Pro. Viewing the evidence in the light most favorable to Mr. Nelson, the court is of the opinion that he has established that he was qualified for the position of Head Tennis Pro, and has therefore established a prima facie case of age discrimination.

    2.   Legitimate, nondiscriminatory reason and proof of pretext.

The defendant has come forward with a legitimate, nondiscriminatory reason for terminating Mr. Nelson: it believed he had mismanaged the tennis program, which mismanagement resulted in a decline in membership participation in the program. Thus, the plaintiff is left with the ultimate burden of producing evidence from which a reasonable factfinder could conclude that ACC's proffered reason is mere pretext for discrimination. *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989). The plaintiff may prove pretext by "put[ting] on sufficient evidence to allow a

factfinder to disbelieve [the] employer's proffered explanation for its actions," *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1532 (11th Cir. 1997), or by directly showing that age discrimination "more likely motivated the employer," *Carter*, 870 F.2d at 584.

The plaintiff has failed to establish that ACC's proffered reason is unworthy of credence. Although Mr. Campbell at some point told Mr. Nelson that everyone was happy with his performance, the evidence shows that the decline in participation in the tennis program was discussed during at least two Board meetings. Thus, it is clear that the Board was, in fact, concerned with participation, and that this concern led them to seek a new Head Tennis Pro to replace Mr. Nelson.[4]

Moreover, the court is of the opinion that Mr. Nelson has failed to present evidence from which a reasonable factfinder could conclude that age discrimination, rather than concerns over participation in the tennis program, more likely motivated ACC to terminate him. In support of his claim that he has presented such evidence, Mr. Nelson argues that Ms. Isbell's comment that younger members complained about his handling of the tennis program, and a

---

[4] Indeed, Mr. Nelson admits that the program suffered a lull under his supervision. The lull may or may not have been Mr. Nelson's fault; however, nothing in the ADEA prevents his employer from concluding that it was his fault and terminating him for it. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) ("[A] court should not act as a 'super-personnel department' by questioning an employer's business judgment.").

search committee member's comment in response to Mr. Nelson's query about the committee's desire to hire a younger Head Tennis Pro, raise an inference that age played a part in Mr. Nelson's termination. However, the court concludes that these comments, standing alone, and in light of the other evidence of record, cannot support a finding that age played a part in the decision to terminate Mr. Nelson. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) (quoting *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 422 (1985)) ("[T]he ADEA commands that 'employers are to evaluate [older] employees . . . on their merits and not their age.'"). Because Mr. Nelson has presented no evidence from which a reasonable factfinder could conclude that he was not evaluated on his merits, but rather was terminated because of his age, ACC's motion for summary judgment is due to be, and will be, granted.

V.   CONCLUSION.

In sum, the motion for summary judgment will be granted in all respects. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___28___ of July, 2003.

                                                  L. SCOTT COOGLER
                                   UNITED STATES DISTRICT JUDGE

F:\WPDOCS\Coogler\CLERK2\Danielle\Memoranda\DISCRIMINATION CASES\Age\Nelson v. ACC, CV-02-CO-2028-E, summary judgment opinion age discrimination.wpd